UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CELETHIA BYRD and <br> WILLIAM MORRIS, <br> as Next Friends of <br> K.B.M, a Minor; and <br> WILLIAM MORRIS, Individually, <br><br> Plaintiffs <br><br> v. <br><br> UNITED STATES OF AMERICA <br><br> Defendant | § § § § § § § § § § § § § § § | CIVIL ACTION NO. 1:14-cv-261 |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Celethia Byrd and William Morris, as Next Friends of K.B.M., a Minor, and William Morris, Individually, by and through their counsel of record, allege as follows:

### I.
### PARTIES, JURISDICTION, SERVICE OF PROCESS, AND VENUE

1.1     This is a medical malpractice case.

1.2     Plaintiffs Celethia Byrd and William Morris are the parents of K.B.M., a minor child. They reside in Travis County, Texas, within the jurisdiction of this Court.

1.3     The Defendant is the United States of America.

1.4     This Federal District Court has jurisdiction of this cause, because this action is brought pursuant to and in compliance with 28 U.S.C §§1346(b), 2671-2680 et seq., commonly

1

known as the "Federal Tort Claims Act," which vests exclusive subject matter jurisdiction of Federal Tort Claims litigation in the Federal District Court.

1.5     The United States of America may be served with process in accordance with Rule 4(I) of the Federal Rules of Civil Procedure by serving a copy of the Summons and of the Complaint on Robert Pitman, United States Attorney for the Western District of Texas, by certified mail, return receipt requested at his office, United States Attorney, Western District of Texas, 601 N.W. Loop 410, Suite 600, San Antonio, Texas 78216 to the attention of the Civil Process Clerk, and by serving a copy of the Summons and Plaintiffs' Original Complaint on Eric Holder, Attorney General of the United States, by certified mail, return receipt requested, at the Attorney General's Office, 10th and Constitution Avenue, N.W., Washington, D.C. 20530, to the attention of the Civil Process Clerk.

1.6     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(B), as the United States is a Defendant and the negligence and damages giving rise to the claim occurred in this district.

## II.
## LIABILITY OF THE UNITED STATES OF AMERICA

2.1     This case is commenced and prosecuted against the United States of America pursuant to and in compliance with Title 28 U.S.C. §§ 2671–80, commonly referred to as the "Federal Tort Claims Act" (FTCA). Liability of the United States is predicated specifically on Title 28 U.S.C. §§ 1346(b)(1) and 2674 because the personal injuries and resulting damages of which complaint is made, were proximately caused by the negligence, wrongful acts and/or omissions of employees of the United States of America at the Lone Star Circle of Care in Round Rock, Texas, and Seton Medical Center in Round Rock, Texas, while acting within the

scope of their office or employment, under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual under the laws of the State of Texas. Under section 224 of the Public Health Service Act, as amended by the Federally Supported Health Centers Assistance Act of 1992 and 1995, employees of eligible health centers may be deemed to be Federal Employees qualified for protection under the FTCA. Lone Star Circle of Care is a federally funded clinic deemed to be covered by the FTCA pursuant to 42. U.S.C. § 233.

### III.
### JURISDICTIONAL PREREQUISITES

3.1    Plaintiffs plead pursuant to Title 28 U.S.C. §§ 2672 and 2675(a), that the claims set forth herein were presented administratively to the Defendant's agency, the Department of Health and Human Services by Celethia Byrd on behalf of K.B.M. on March 8, 2013, and on behalf of William Morris, individually on March 21, 2013. The claims were both denied on September 26, 2013. Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to commencement and prosecution of this litigation.

### IV.
### THE DEPARTMENT OF HEALTH AND HUMAN SERVICES IS AN AGENCY OF THE UNITED STATES

4.1    The United States Department of Health and Human Services is an agency of the United States of America. The United States of America, Defendant herein, through its agency, the United States Department of Health and Human Services, at all times material hereto, owned, operated and/or controlled the health care facilities known as the Lone Star Circle of Care and it's partnership with Seton Medical Center located in Round Rock, Texas, and through its agency, the United States Department of Health and Human Services, staffed said health care

facilities with its agents, servants, and/or employees. Lone Star Circle of Care is a federally funded clinic deemed to be covered by the FTCA pursuant to 42. U.S.C. § 233.

## V.
## EMPLOYMENT AND COURSE AND SCOPE

5.1     At all times material hereto, all persons involved in the medical and health care services provided to Plaintiffs at the Lone Star Circle of Care and Seton Medical Center Round Rock, were agents, servants, and/or employees of the Department of Health and Human Services, the United States of America, or some other agency thereof, and were at all times material hereto, acting within the course and scope of such employment.

## VI.
## FACTS

6.1     This claim concerns the substandard medical, nursing, and hospital care provided by agents, servants, and employees at the Lone Star Circle of Care and Seton Medical Center including, but not limited to, the failure to diagnose and properly treat breech presentation; failure to timely deliver by C-section, failure to obtain informed consent for a vaginal delivery of a breech baby; failure to have a pediatric/neonatology team present at delivery; and failure to timely and properly resuscitate the baby.

6.2     In January 2012, Celethia Byrd, then pregnant with K.B.M., moved from San Angelo to Austin. She transferred her prenatal care to Lone Star Circle of Care. Dr. Sabrina Hanna was her obstetrician.

6.3     Ms. Byrd's prenatal ultrasounds were all normal. On January 30, 2012, in Ms. Byrd's 29 week ultrasound, she was noted to have a breech presentation. Ms. Byrd was not told that her ultrasound showed a breech presentation.

6.4     On February 10, 2012, at 30 weeks' gestation, Ms. Byrd was assessed on physical examination as having a breech presentation. This information was not shared with Ms. Byrd.

6.5     On February 16, 2012, a follow-up ultrasound was performed per the order of Kimberly Blankenship, WHNP. Ms. Byrd was assessed to be 31 weeks, 4 days gestation. Again, breech presentation was confirmed on ultrasound but not conveyed to Ms. Byrd. The ultrasound also confirmed a normal appearance of the baby with no visible abnormalities, including the head, brain, and skeleton with no anomalies and normal amniotic fluid levels.

6.6     On February 24, 2012 and March 5, 2012 Ms. Byrd's presentation was not assessed or documented.

6.7     On March 9, 2014, at 33 weeks, 5 days gestation, Ms. Byrd was assessed on physical examination as having breech presentation. No one told Ms. Byrd that she had a breech presentation.

6.8     On March 16, 2012, at 34 weeks, 5 days gestation, Ms. Byrd was again assessed on physical examination as having breech presentation. No one told Ms. Byrd that she had a breech presentation at that appointment, or that she had a breech presentation for the preceding six weeks.

6.9     On March 23, 2012, when Ms. Byrd was 35 weeks, 5 days gestation, without explanation for the change, providers documented in the prenatal records that the baby was in vertex presentation. Without intervention, it is difficult for a baby to turn from breech to vertex later in pregnancy due to the size of the baby. The chances of a change in fetal presentation at this late stage – between almost 35 and 36 weeks' gestation – was not discussed with Ms. Byrd, nor was it verified by ultrasound. From that point forward, Ms. Byrd's labor was improperly managed as if the baby was in vertex presentation.

5

6.10   Detection of non-cephalic presentation is important for timely management and clinical decision making. Breech presentation should be accurately diagnosed through the Leopold's maneuvers. Leopold's consists of four simple, non-invasive maneuvers conducted to determine position, presentation and engagement of the fetus. The Leopold maneuver to determine the lie of the fetus was not discussed or attempted at Ms. Byrd's prenatal appointments.

6.11   If there is a question of fetal presentation, an ultrasound is required by the standard of care. Despite the change in assessment of fetal position after 6 weeks of a documented breech presentation, no ultrasound was offered or conducted to verify fetal presentation.

6.12   When breech presentation is identified, external cephalic version (ECV) can be attempted to turn the fetus to the cephalic position. The standard of care requires obstetricians to offer and perform ECV whenever possible. An attempt to turn the baby through ECV was not discussed with Ms. Byrd or attempted.

6.13   In breech presentations, a cesarean section (C-section) must be offered, with the risks and benefits of vaginal versus C-section breech delivery explained, so the mother can make an informed decision. A C-Section was not offered, discussed, or planned.

6.14   The standard of care requires the discussion of the risks of vaginal breech delivery and delivery by C-Section, as well as detailed documentation of the informed consent.  Ms. Byrd was never offered any discussion about the risks of a vaginal delivery with breech presentation relative to the risks of a C-section.  Her informed consent to a vaginal breech delivery was not documented or obtained.

6.15   One factor in making an informed decision whether to proceed with a breech vaginal delivery involves the skill level of the practitioner. C-sections should be utilized by all but the most experienced providers as the preferred mode of delivery in breech presentations. Ms. Byrd was never told the experience level of her delivering provider with handling breech vaginal deliveries to make an informed decision to proceed with a vaginal breech delivery. Informed consent was not documented or obtained.

6.16   On April 4, 2012, Ms. Byrd was admitted for induction due to mild pre-eclampsia. At the time of admission, at approximately 18:50 on April 4, 2012, Ms. Byrd was having irregular contractions, her membranes were intact and her cervical exam revealed 4cm dilated, 70% effaced, and the baby was at -2 station. The plan was to start induction of labor with Pitocin.

6.17   Dr. Yamamoto and Dr. Hanna, as well as the other health care providers caring for Ms. Byrd, failed to properly check fetal presentation and diagnose breech presentation on admission. Dr. Krissy Yamomoto incorrectly documented presentation as "cephalic." During a vaginal exam, providers should be able to differentiate vertex, face and breech presentation. If the vertex is presenting, a provider should sweep their fingers over the fetal head and determine where the sagittal suture is. The position of the two fontanels should be ascertained. None of the providers who performed a vaginal exam of Ms. Byrd ever attempted to locate the suture or fontanels, or documented the inability to find the location of those important markers.  The failure to properly conduct vaginal exams contributed to the ongoing misdiagnosis of Ms. Byrd with a vertex presentation.

6.18   Induction and augmentation of labor with breech presentation should not be conducted without informed consent obtained, including a discussion of the significant,

increased risks of the induction and augmentation of labor with breech presentation. Ms. Byrd was never offered a discussion about the increased risks of an induced/augmented labor with a breech presentation, and informed consent to induction and augmentation of labor with a breech presentation was not documented or obtained.

6.19   Oxytocin was started at 19:39 to induce labor. At 22:24, Mary Duncan, RN documented uterine hyperstimulation (tachysystole).  Hyperstimulation of the uterus is extremely dangerous to both the mother as well as the fetus. Normal uterine contractions during delivery have a recovery period between contractions for the baby. During hyperstimulation of the uterus, there are intense, erratic contractions without recovery periods leading to fetal distress.

6.20   Tachysystole adversely affects the oxygenation of the fetus.  Diminished oxygen supply to the fetus leads to fetal hypoxia evidenced by fetal heart rate (FHR) decelerations on the fetal monitor strip (FMS). The FMS began to change from a reassuring strip to abnormal tracings, with late decelerations indicative of fetal distress with the contraction pattern demonstrating tachysystole.  Nurse Duncan failed to communicate Ms. Byrd's hyperstimulation to a physician.

6.21   Nurse Duncan documented late decelerations at 22:24 with the FHR interpretation progressing to Category 2. Late decelerations are a transient decrease in heart rate occurring at or after the peak of a uterine contraction and often indicate fetal hypoxia. A Category 2 tracing is indeterminate and fetal well-being must be assessed and closely monitored. Nurse Duncan failed to communicate the late decelerations and tachysystole pattern to a physician. Fetal well-being was not assessed and the baby was not closely monitored.

6.22   Meanwhile, Ms. Byrd's labor was not progressing as expected. At 01:42, a cervical exam revealed that Ms. Byrd's labor had not progressed since admission. With breech

presentation, labor often fails to properly progress. The fetal buttocks are not able to mold to stimulate cervical dilatation as the head does with vertex presentation. Ms. Byrd's cervix remained at 4 cm dilated, 70% effaced, and -2 station. She had not progressed for 7 hours despite oxytocin and hyperstimulation of the uterus. Additionally, Ms. Byrd was experiencing tremendous pain, despite an epidural being placed at 02:45. With the history of two ultrasounds at 29 and 31 weeks showing breech presentation, prenatal exams documenting breech presentation through 34 weeks, the failure to progress in labor, severe pain (9 to 10/10) despite pain medication, and pain located in her buttocks, providers should have considered breech presentation on their differential diagnosis and attempt to rule it out. There is no indication that breech presentation was ever on any health care provider's differential during labor and no attempt was made to rule it out.

6.23  At 05:00, hyperstimulation was still occurring and unresolved by nursing interventions of IV fluids or a position change. Nurse Duncan never notified Dr. Hanna or any physician of the ongoing nonreassuring strip findings despite nursing interventions.

6.24  By 06:10, the SVE (sterile vaginal exam) showed Ms. Byrd was finally progressing. Her cervix was 8cm dilated and 90% effaced. Yet the baby was not engaging, as the station remained -2. Ms. Byrd continued to complain of severe buttock pain and pressure. At 07:00, the nurse began documenting inadequate accelerations on the FMS, but failed to inform the physician of the inadequate accelerations.

6.25  At 08:05, Dr. Hanna, OB Attending, was at the bedside to evaluate Ms. Byrd. The vaginal exam showed Ms. Byrd was 9cm dilated, 100% effaced and the baby was at 0 station. Ms. Byrd's amniotic membranes were ruptured. Once the membranes are ruptured, the

9

presenting part of the fetus can be visualized and a reasonably prudent provider should have diagnosed the breech presentation. Still, providers failed to diagnose the breech presentation.

6.26   Once membranes are ruptured, the risk of cord compression and cord prolapse are significantly increased. A vaginal exam should have been performed and documented following rupture of membranes to check for a prolapsed cord.  There is no indication that any provider performed a vaginal exam following the rupture of membranes at 8:00, and the next vaginal exam did not take place until 8:55 by Nurse Rebne.

6.27   Despite the abnormalities of the FMS, Dr. Hanna failed to ensure fetal well-being and correctly assess presentation. Instead, based on her incorrect assumptions of vertex presentation and fetal well-being, she ordered an increase in the Oxytocin dose to increase intensity of contractions. She did not return to the bedside until delivery was imminent.

6.28   By 08:30, the FMS interpretation documented variable, early decelerations along with the inadequate accelerations. Renee Rebne, RN at 08:55 performed a trial of pushing. Ms. Byrd's vaginal exam was 9.5cm dilated, 100% effaced, and 0 station. Despite visualizing the baby's buttocks, Nurse Rebne failed to recognize the breech presentation and documented the baby's buttocks as the head. Her note [incorrectly] stated, "Trial pushes with one contraction-cervix on right easily slides around babies head-will continue to labor down." In performing a vaginal exam, Nurse Rebne failed to attempt to locate the sagittal suture or fontanels of the baby's head. "Labor down" refers to passive descent of the fetus with delayed pushing while waiting for descent.  The baby was still at station 0, meaning he was engaged but stuck in the mid-pelvis - most likely due to the breech presentation.

6.29   Based on the records, at approximately 10:10, the exam revealed 10cm dilation, 100% effacement, and the baby was at 1 station. Pushing began. Once Ms. Byrd began

10

attempting to push the baby out in the breech position, the FMS took a significant turn for the worse. By 10:12 the FMS showed late decelerations into the 90's. At 10:30, Ms. Byrd's pain intensity was 10/10 despite having an epidural. The FMS showed decelerations down to 90. At 10:45 FMS showed, "Heart rate variability-marked (greater than 25bpm); Decelerations-variable, combined pattern; Category 2.

6.30    At 10:55, Renee Rebne called Dr. Hanna. The note stated, "Clinician contacted via personal communication via phone. Information provided to clinician- patient +2 station, physician coming." There is no documentation in the record that Nurse Rebne communicated any of the nonreassuring findings on the FM strip to Dr. Hanna.

6.31    At 11:00 the FMS continued to show "Heart rate variability-marked (greater than 25bpm); Decelerations-combined pattern; Category 2." The baby's heart rate was reaching highs in the 190's with decelerations down to 50-70bpm, another nonreassuring finding. Dr. Hanna was "in and prepped for delivery." At that time, the frank breech presentation was finally recognized as the baby's buttocks were about to be delivered. The note stated, "Noted that presenting part was buttocks as infant begins crowning; FHR down to 110's, patient laid completely flat to assist in pushing out breech infant." The last 5 minutes of labor, the baby's heart rate had drastic decelerations from the 180's down to the 50's (130bpm variability).

6.32    K.B.M. experienced numerous episodes of oxygen deprivation during the labor and delivery process and his oxygen reserves had been exhausted by the time he was born. At birth he was limp, blue, not breathing and with a heart rate of 60 at 11:05. He was delivered in the frank breech position. Frank breech presentation occurs when the lower extremities of the baby are flexed at the hips and extended at the knees, and the feet lie in close proximity to the head.

6.33 No pediatrician or neonatologist was present at birth. According to the records, the only health care providers present were "Delivery Physician: Hanna, Sabrina MD; Circulating Nurse (1): Rebne, Renee RN; Circulating Nurse (2): Simpson, Nancy RN; Surgical/OB Technician: Garcia, Jennifer; Newborn Attendants (Nursing): Narducci, Andrea RN." Given the breech presentation, a pediatrician or neonatologist should have been present at delivery. When the FMS showed nonreassuring signs of fetal distress in addition to the breech presentation, providers should have called a "Code Pink" to emergently call the pediatric resuscitation team to delivery. No "Code Pink" was called.

6.34 At birth, K.B.M. was limp, cyanotic, with a heart rate of 60 and not breathing upon delivery. Following the delivery, K.B.M. was not properly resuscitated for 6 minutes until a pediatrician finally arrived, exacerbating his hypoxic condition causing a permanent brain injury.

6.35 K.B.M.'s Apgar was 2 at 1 minute, requiring immediate resuscitation from a provider experienced in neonatal resuscitation. K.B.M.'s Apgar at 5 minutes was only 3. However, after appropriate resuscitative support finally occurred after the arrival of the pediatrician, an Apgar of 9 at 10 minutes of life was achieved, demonstrating K.B.M's ability to respond to appropriate resuscitation measures.

6.36 Dr. Cristiana Lin's note provided evidence that proper resuscitative measures did not occur until she arrived. The note stated, "Arrived at 6 minutes of life. At delivery, the infant was breech. He was limp, blue and apneic. HR 60. He was started on PPV right after delivery. On my arrival, infant was breathing irregularly, pale, limp. PPV continued x30 sec more. He became vigorous thereafter, (total PPV time 6.5 min). He was brought to the NICU for further assessment." The baby was in significant distress when delivered and inadequate oxygenation continued for 6 minutes exacerbating his hypoxic, acidotic state. Once Dr. Lin arrived and

provided proper oxygenation, K.B.M. immediately responded and became "vigorous" after just 30 seconds of proper PPV oxygenation by Dr. Lin.

6.37    Besides the hypoxic brain injury K.B.M. suffered due to the improperly managed vaginal breech delivery, he also suffered significant skeletal injuries including a fracture of his femur.

6.38    Shortly after birth, K.B.M. experienced episodes of decreased O2 saturation. He was transferred to Dell Children's Medical Center for additional treatment and work-up. The admission exam at Dell also described the positioning abnormalities of K.B.M.'s extremities due to the breech delivery. Due to the traumatic delivery, "scattered bruising from delivery over buttocks, legs, arms" was also documented.

6.39    The U.S. Government health care providers were negligent in failing to diagnose and treat the breech presentation. Because providers failed to recognize the breech presentation, they negligently failed to provide Ms. Byrd many options, and failed to educate her about the risks of proceeding with their induced vaginal delivery plan. Providers negligently failed to obtain Ms. Byrd's informed consent to proceed with an induced vaginal delivery with a breech presentation.

6.40    During labor and delivery, providers failed to properly monitor and respond to many nonreassuring signs on the FMS. The nursing staff negligently failed to notify physicians of uterine hyperstimulation, lack of adequate accelerations, minimal variability, variable and late decelerations, and drastic decelerations from the 180s down to the 50s. Physicians negligently failed to monitor the FHM strip or inquire of the nurses as to these findings. Providers negligently failed to deliver the baby via C-section. Providers failed to timely call a "Code Pink" and have ready at delivery a pediatric and/or neonatal team experienced in resuscitation.

6.41    These numerous breaches in the standard of care caused permanent, devastating injuries to K.B.M. Had K.B.M. been properly delivered via planned cesarean section, more likely than not, he would not have suffered any brain injury or injuries to his extremities. The full extent of damages to K.B.M. is not known at this time due to his young age, but K.B.M. is almost 2 years old and he cannot crawl, he cannot talk, he has a tracheostomy and is undergoing extensive physical, occupational and speech therapy.

## VII.
## CAUSE OF ACTION AGAINST THE UNITED STATES OF AMERICA

7.1    Defendant, the United States of America, was negligent in their care and treatment of Celethia Byrd and K.B.M. in the following ways, including but not limited to:

(a)    Failing to diagnose and recognize the breech presentation.

(b)    Failing to timely and properly perform Leopold's maneuvers.

(c)    Failing to properly perform vaginal examinations by attempting to locate the sagittal suture line and fontanels.

(d)    Failing to discuss and provide Ms. Byrd the option for ECV to attempt to turn the baby.

(e)    Failing to offer Ms. Byrd a C-section.

(f)    Failing to counsel Ms. Byrd about the risks of proceeding with a vaginal delivery of a breech presentation.

(g)    Failing to counsel Ms. Byrd about the risks of inducing and augmenting her breech delivery with Pitocin.

(h)    Failing to counsel and disclose to Ms. Byrd the experience level of her delivering providers with vaginal breech delivery prior to obtaining her consent for a vaginal breech delivery.

(i)    Failing to obtain Ms. Byrd's fully informed consent to proceed with an induced vaginal delivery with a breech presentation.

(j) Nurses failing to notify physicians of uterine hyperstimulation during labor and delivery.

(k) Nurses failing to notify physicians of nonreassuring signs on the FHM, including lack of adequate accelerations, minimal variability, variable and late decelerations, and drastic decelerations from the 180's down to the 50's.

(l) Failing to induce accelerations in the FHR to rule out fetal acidemia.

(m) Nurses and physicians failing to recognize and act on a persistently nonreassuring FHR pattern.

(n) Negligently administering Pitocin when it was contraindicated with breech presentation.

(o) Negligently increasing the Pitocin dose with a nonreassuring FM strip pattern.

(p) Failing to timely discontinue Pitocin.

(q) Failing to order prophylactic antibiotics one hour prior to a planned Cesarean Section.

(r) Failing to timely call a "Code Pink" and have ready at delivery a pediatric and/or neonatal team experienced in resuscitation.

(s) Failing to properly and timely care for Celethia Byrd and K.B.M.

(t) Failing to properly and timely diagnose and treat Celethia Byrd and K.B.M.

(u) Failing to properly and timely monitor Celethia Byrd and K.B.M.

(v) Failing to properly and timely deliver the baby via C-section.

7.2 At all times mentioned herein, the employees, agents, and/or representatives of the United States Government were negligent and proximately caused all of the injuries and damages sustained by Plaintiffs.

## VIII.
## DAMAGES

8.1 As a direct and proximate result of Defendant's negligent acts and/or omissions, Plaintiff K.B.M., has suffered, and continues to suffer, severe injuries, including but not limited to:

- (a) Past and future physical pain, suffering, and mental anguish;
- (b) Past and future medical, health care and attendant care expenses;
- (c) Loss of earnings and earning capacity;
- (d) Past and future physical impairment;
- (e) Past and future mental impairment;
- (f) Past and future physical disfigurement;
- (g) Loss of enjoyment of life; and
- (h) Other pecuniary damages.

Such injuries are, in reasonable probability, permanent in nature. The minor Plaintiff, K.B.M., by and through his next friends Celethia Byrd and William Morris, brings this suit to recover all damages cognizable under the law resulting from the injuries to him as a result of the occurrence in question.

8.2 As a direct and proximate result of Defendants' negligence, Plaintiff William Morris, as the father of K.B.M., has suffered, and continues to suffer, the following injuries, including but not limited to:

- (a) Past and future mental anguish;
- (b) The reasonable cost and value of all necessary and extraordinary attendant care that he has provided in the past and will be providing in the future to his child by the reason of his disabling injuries and resulting medical conditions,
- (c) Past and future medical, health care, and attendant care expenses for K.B.M. until his eighteenth birthday;

  (d)  Past and future out-of-pocket expenses; and

  (e)  Other pecuniary damages.

# IX.
# PRAYER

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs request that the Defendant be cited in terms of law to appear and answer herein; that upon final trial and hearing hereof, the Plaintiffs have judgment against the Defendant in the amount of twenty million dollars ($20,000,000.00) in damages, and for such other and different amounts as they shall show by proper amendment before trial; for post judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other and further relief, at law and in equity, both general and special, to which the Plaintiffs may show themselves entitled and to which the Court believes them deserving.

Dated this 25th day of March, 2014.

        Respectfully Submitted,

        ARCHULETA, ALSAFFAR & HIGGINBOTHAM
        Laurie M. Higginbotham
        Texas State Bar No. 50511759
        Tom Jacob
        Texas State Bar No. 24069981

        By /s/ Laurie M. Higginbotham_____
          Attorneys for Plaintiffs
          Archuleta, Alsaffar & Higginbotham
          PO BOX 340639
          Austin, TX 78374
          (512) 266-7676
          (512) 266-4646 (Fax)
          lhigginbotham@govtclaim.com